T.C. Summary Opinion 2005-161

UNITED STATES TAX COURT

RHEA IONE SUPPLEE NEGOESCU, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 11500-03S.         Filed November 8, 2005.

Rhea Ione Supplee Negoescu, pro se.

<u>Julie L. Payne</u>, for respondent.


HOLMES, <u>Judge</u>: Rhea Negoescu and her ex-husband had constant problems with the IRS while they were married. Although they filed joint tax returns each year, they usually did not have enough money to pay the tax due. Negoescu now asks for relief from the still unpaid tax liabilities for two of those years, 1991 and 1992.[1]

_____

[1] The case was tried as a small case under Internal Revenue
(continued...)

## Background

Rhea Negoescu married William Supplee in 1982, and they had two children. For much of their marriage--including 1991 and 1992, the years at issue here--he owned Red Hawk Express, a small trucking company in Alaska. Supplee drove the truck and kept it in good repair, and Negoescu kept the books. She collected, categorized, and recorded all the business receipts to provide to their accountant. The two shared the joint checking account used for Red Hawk Express; Negoescu had signature authority for the account, kept the check register, and regularly balanced it.

Negoescu also had her own part-time business, Du-Rite Cleaning, and worked as an admissions clerk at a hospital in Fairbanks. She deposited her paychecks, her business receipts, and the checks she received for her children from the Alaska Permanent Fund (a unique state institution that provides annual dividends to Alaskans from oil and gas royalties paid to the State) into an individual checking account. Only she had access to the check register for this account; only she knew its balance at any time.

The couple filed joint tax returns for both 1991 and 1992, which showed taxes due of about $4,000 for both years. When

[1](...continued)
Code sections 6330 and 7463(f). (All section citations are to the Code as currently in effect.) Trial as a small case means that this decision is not reviewable by any other court, and this opinion should not be cited as precedent.

Negoescu signed the return, she knew that it showed taxes due; she also knew that she and her husband did not have enough money to pay.

The Supplees had many problems with the IRS all during their marriage, and these problems frequently caused fights between them. Negoescu was aware since 1984 that her husband was not filing their returns on time. She was also aware that he was not paying their tax bills as he should. The cause of this problem was that he kept underpaying the estimated taxes from the trucking business--which then led the couple to owe money when their taxes came due each April. The accumulated interest and additions to tax for underpayment and late payment quickly added up to a considerable burden. We believe Negoescu when she testified that he got angry when she asked him about what was happening with the IRS. We also believe her testimony that the tension this caused contributed to their divorce in April 1997.

By the time of that divorce, their total joint tax debt (including their 1991 and 1992 taxes) was about $45,000, and in their divorce decree Supplee promised to pay it all. And he did pay quite a bit but, for whatever reason, never managed to pay it off completely. In July 2001, the Commissioner sent Negoescu a notice of intent to levy--a form to tell her that the IRS was about to start seizing her property to pay the approximately $23,000 in unpaid 1991 and 1992 taxes. This alarmed her, and so

on August 29, 2001 she mailed in a request for a collection due process (or CDP) hearing--and mailed it to the correct IRS service center. At nearly the same time, though, she also sent the IRS a Form 8857, used to request innocent spouse relief. It seems that she was being cautious--a taxpayer in her position can ask for innocent spouse relief at the CDP hearing, and doesn't need to ask for innocent spouse relief separately.

And here her troubles began, because she seems to have mailed her Form 8857 to the same IRS service center to which she had mailed her request for a CDP hearing--instead of handing it to the Appeals officer at the hearing or mailing it to the special address for innocent spouse relief requests, as the instructions for the Form 8857 say she should have done. She also didn't mention her wish for innocent spouse relief on the form that she used to ask for a CDP hearing. Her Form 8857 got lost in the IRS bureaucracy, with an incorrect entry in a computer database showing that the request was being considered by the IRS's Compliance Division when it really wasn't. Not until October 2002--more than a year after she sent it in--did the IRS Appeals officer in Alaska who was looking at Negoescu's request for a CDP hearing discover the mistake. That Appeals officer then quickly sent the Form 8857 to the section of the IRS that reviews and decides innocent spouse requests--the Cincinnati Centralized Innocent Spouse Operation (which despite its name is

actually in Kentucky). So at the end of 2002, a year-and-a-half after sending in her request for a CDP hearing and her Form 8857, Negoescu had received decisions on neither.

The Appeals officer who discovered this snafu quickly tried to set things right, sending a letter to Negoescu in January 2003 asking her to complete a more detailed Innocent Spouse Questionnaire and also asking her to call to set up a CDP hearing. Negoescu did not respond. An IRS employee in Kentucky was also trying to reach her that month, making phone calls to her in Alaska to ask for more information, but was never able to reach her. Negoescu claimed that the problem was her decision to drop her P.O. Box address (the one she had used as her return address on the requests for a CDP hearing and innocent spouse relief), followed by a period when her mail wasn't being forwarded to her residential address.

Getting no response, the Appeals officer never held a CDP hearing. In April 2003, she finally denied Negoescu's request for innocent spouse relief, and on the same day mailed out a letter sustaining the Commissioner's decision to levy on Negoescu's property. She noted that

> The taxpayer was asked to answer questions
> and provide information to support her
> innocent spouse claim; she failed to respond.
> The taxpayer failed to respond to letters
> sent to her regarding the innocent spouse
> claim or to a letter offering her a
> collection due process hearing in Appeals.

> The taxpayer presented no other relevant
> information and did not provide any
> collection alternative.  No financial
> information was provided.

Negoescu filed her petition seeking review in July 2003, and did not fill out the IRS questionnaire until October.  She also provided other evidence at the trial, which was held in Alaska, where she resided when she filed her petition.

## Discussion

Married couples may choose to file their Federal tax returns jointly.  Sec. 6013(a).  If they do, both are responsible for the accuracy of the return and both are liable for the entire tax due.  Sec. 6013(d)(3); Butler v. Commissioner, 114 T.C. 276, 282 (2000).

In some cases, however, section 6015 can provide relief from that liability.  Under section 6015(b), a spouse may seek either full or partial relief; under section 6015(c), the tax liability can be split between two former or separated spouses.  Both these provisions, however, require that the liability in question arise from a "deficiency," which means that a couple underreported their taxes.  In this case, the Commissioner agrees that the Supplees correctly filled out their tax returns for both 1991 and 1992, so there is no deficiency.

That means that Negoescu is in what's called an "underpayment situation"--there's no dispute over how much tax she and her ex-husband owe, only about who has to pay it.  When

there's an underpayment, the Court has to look at a different part of the tax law, section 6015(f). This section lets one spouse out of having to pay taxes if "it is inequitable to hold the individual liable for any unpaid tax." Sec. 6015(f). The Commissioner writes a guide, called a "revenue procedure," that tells IRS employees what to look for in deciding questions of "inequitability". Washington v. Commissioner, 120 T.C. 137, 147-152 (2003); Jonson v. Commissioner, 118 T.C. 106, 125-126 (2002), affd. 353 F.3d 118 (10th Cir. 2003). Revenue Procedure 2000-15 was the procedure in effect when the Commissioner issued his final notice of determination to Negoescu, and that's the revenue procedure that we look at in reviewing what he did. Rev. Proc. 2000-15, 2000-1 C.B. 447.

We begin by noting that Negoescu has the burden of proof, Alt v. Commissioner, 119 T.C. 306, 311 (2002), affd. 101 Fed. Appx. 34 (6th Cir. 2004). This means that she must show that the Commissioner abused his discretion--in other words, that he was arbitrary, capricious, or acting without sound basis in fact when he denied her relief. Jonson, 118 T.C. at 125; Butler v. Commissioner, 114 T.C. 276, 291-292 (2000).

The revenue procedure begins with a list of conditions that a person trying to win innocent spouse relief *must* show. These include proof that she filed a joint return, did not qualify for relief under section 6015(b) or (c), and did not fraudulently

transfer property to anyone to avoid paying taxes. Rev. Proc. 2000-15, sec. 4.01, 2000-1 C.B. at 448. The Commissioner admits that Negoescu meets all these conditions.

The revenue procedure then provides for a safe harbor; if Negoescu met these conditions, she would ordinarily get relief. Rev. Proc. 2000-15, sec. 4.02. To qualify, Negoescu must show that (a) she is either separated or divorced, (b) she did not know when she signed the returns that the tax liabilities would not be paid, and (c) she would suffer economic hardship if she doesn't get relief. Id. Negoescu did show that she and Supplee are divorced; however, we find that she knew that the taxes would not be paid. Since she was keeping the books of both Red Hawk Express and her own checking account, she knew that she and Supplee did not have the money to pay the taxes due. Negoescu's knowledge of the delinquent tax payments means she fails to meet the safe harbor.

This leaves a balancing test--eight factors to consider before deciding if relief would be "equitable." Rev. Proc. 2000-15, sec. 4.03. These factors are not the only ones which the Commissioner and we can look at, but they are where we start. Id.; Ewing v. Commissioner, 122 T.C. 32, 47-48 (2004).

We can summarize those factors in a table:

| Weighs for Relief | Neutral | Weighs against Relief |
|---|---|---|
| *Separated or divorced* | Still married | N/A |
| Abuse present | No abuse present | N/A |
| N/A | *No significant benefit from the deficiency or underpayment* | Significant benefit |
| N/A | Later compliance with Federal tax laws | Lack of later compliance with Federal tax laws |
| No knowledge of deficiency or underpayment | N/A | Knowledge |
| Economic hardship if taxes had to be paid | N/A | No economic hardship |
| Tax liability attributable to non-requesting spouse | N/A | Liability attributable to petitioner |
| Non-requesting spouse responsible for paying tax under divorce decree | No divorce decree | Petitioner responsible for paying tax under divorce decree |

The parties agree on two of the factors (those in italics), and we now turn to the rest:

Abuse:  Negoescu maintains that Supplee emotionally abused her throughout the course of their marriage; however, she did not offer any evidence in support of her argument other than her own testimony.  And we find that the Commissioner was not clearly wrong in finding that her marital situation--though full of heated arguments over money--did not sink to the level of abuse.

This factor is neutral.

Later compliance:  Negoescu and Supplee did not make full and timely payment for their 1993 tax bill.  Though Negoescu did have money withheld from her job at the hospital, and though she also paid an additional $833 with the return, she was still short $747.  The full amount, including interest and penalties, was not paid until 1995, when her expected refund for 1994 was credited to the balance due.  This means that she has not consistently complied with the Federal tax laws by making timely payments.  This factor weighs against her.

Knowledge:  As we mentioned above, Negoescu knew when she signed the 1991 and 1992 tax returns that the liabilities shown on those returns would not be paid.  This factor also weighs against her.  Furthermore, the revenue procedure states, "This is an extremely strong factor weighing against relief," making this factor more important than the others.  Rev. Proc. 2000-15, sec. 4.03(2)(b), 2000-1 C.B. 447.

Economic Hardship:  The factor forces us to ask whether Negoescu would be able to pay her reasonable basic living expenses if she does not receive relief.  Alt, 119 T.C. at 314-315.  While she claims that her monthly expenses are more than her monthly income, she did not show any documentary evidence that this is true.  She testified that her monthly wages from her job at the hospital were about $2400 a month.  She also received

$400 a month in rent from some real property she owned, about $100 a month from the Alaska Permanent Fund, and about $300 a month in child support from her husband.

She testified that her monthly expenses include rent and utilities of about $960 for her current residence, health insurance of $200, clothing for her and her daughter of about $200, and college tuition of $100. She contributes about $230 per month toward her pension and union dues. Her current pension balance is about $1500 and she has another $100 in a savings account. While she does own some real property, we do not know whether it is worth enough to pay the outstanding tax liability if sold or refinanced.

Based on her testimony, her total monthly income is about $3200 a month, while her expenses are about $1700 a month. Although these numbers are a bit different from those in the Innocent Spouse Questionnaire that she finally filled out in October 2003, we cannot say she's proven that she would suffer economic hardship if she were not relieved of liability, and we have to conclude that this factor weighs against relief.

Liability attribution: While Negoescu insists that more than enough money was withheld from her paychecks to pay the tax on her wages from the hospital and her earnings from Du-Rite Cleaning, she did also play an active role in Red Hawk Express. The unpaid tax liabilities for 1991 and 1992 came from that

business, and so liability for those taxes is attributable to her
as well as to Supplee.  This factor also weighs against relief.

Payment Responsibility:  According to the divorce agreement,
Supplee is responsible for the payment of the disputed
liabilities.  This is a factor weighing in her favor.  The table
of conditions now looks like this:

| Weighs for Relief | Neutral | Weighs against Relief |
|---|---|---|
| Separated or divorced | | |
| | No abuse present | |
| | No significant benefit | |
| | | Lack of later compliance with Federal tax laws |
| | | Knowledge |
| | | No economic hardship |
| | | Liability attributable to petitioner |
| Non-requesting spouse responsible for paying tax under divorce decree | | |

Thus, Negoescu has only two factors weighing toward relief,
four weighing against relief, and two that are either neutral or
inconclusive.  These factors are not all equally weighty--
Negoescu's knowledge that the tax liabilities would not be paid,

is an "extremely strong factor weighing against relief."

The revenue procedure does go on to say: "[n]onetheless, when the factors in favor of equitable relief are unusually strong, it may be appropriate to grant relief under section 6015(f) in limited situations where a requesting spouse knew or had reason to know that the liability would not be paid."  Rev. Proc. 2000-15, sec. 4.03(2)(b), 2000-1 C.B. 447.  The two factors weighing toward relief--that Negoescu divorced Supplee and that he agreed to be responsible for the tax liabilities--are not strong enough.  Negoescu's reliance on these two factors boils down to saying that her ex-husband broke his promise to pay the taxes they both owed.  While that is true, the Commissioner was not a party to that agreement, and so it's usually fair for him to try to collect unpaid taxes from both spouses who signed a return.  Pesch v. Commissioner, 78 T.C. 100, 128-129 (1982).  We think this is especially true where the income triggering the unpaid tax was produced--at least in part--by both spouses, as in Negoescu's case.

Our opinion is based on the evidence presented at trial, evidence that the Commissioner did not have when he made his determination.  In a recent case, Robinette v. Commissioner, 123 T.C. 85, 112, 115, 119 (2004) (Wells, Thornton, and Wherry, JJ., concurring), many of the Tax Court's judges warned that if the Commissioner did not have evidence because a taxpayer withheld evidence during the appeals process, we should limit our review

to only the evidence the Commissioner did have.  Negoescu is just that sort of taxpayer.  After asking the IRS for relief, she gave the Commissioner no information to help him decide her case.  Once she filed her petition with us, however, she was forthcoming with exhibits and testimony so that we could make an informed decision.  But our decision would be the same even if we limited our review to the record that the Commissioner had.

<u>Decision will be entered for the respondent</u>.